# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       **Plaintiff**,

v.

DIMAS SIMOES CALIXTO-FILHO,

       **Defendant**.

Case No. 21-20052-04-DDC

## MEMORANDUM AND ORDER

This case requires the court to address how English proficiency interacts with the voluntariness requirement of self-incriminating statements.

Defendant Dimas Simoes Calixto-Filho moves to suppress all statements he made to law enforcement officers at arrest and during a subsequent interrogation.  He contends that officers never read him his *Miranda* rights.  And—if they did, Mr. Calixto-Filho asserts—his English fluency level doesn't suffice to qualify his *Miranda* waiver as knowing and voluntary.  Finally, he argues that other circumstances—an alleged atmosphere of intimidation at his arrest and an alleged refusal to provide requested counsel—undermine voluntariness, as well.  In light of these arguments, Mr. Calixto-Filho moves for suppression.

The government, for its part, responds that Mr. Calixto-Filho received, and waived, his *Miranda* rights.  And the government contends that Mr. Calixto-Filho's use of English during the interrogation and in his daily life demonstrates sufficient fluency for him to waive those rights

knowingly and voluntarily.  Finally, the government asserts, the alleged other circumstances didn't undermine voluntariness.

The court concludes the government meets its burden to prove, by a preponderance of the evidence, that Mr. Calixto-Filho received and waived his *Miranda* rights.  The court also determines that Mr. Calixto-Filho's level of English proficiency didn't hinder his ability to understand those *Miranda* rights.  And finally, the court concludes the evidence presented about the other circumstances—the alleged intimidation and denial of counsel—doesn't undermine voluntariness either.  The court thus denies Mr. Calixto-Filho's Motion to Suppress (Doc. 534).  It explains these conclusions, below, after outlining the relevant factual background.

## I.        Factual Background and Findings

The court held an evidentiary hearing on the motion on May 17, 2024.  Unless otherwise noted, the court derives the following factual findings from evidence presented at that hearing.

### *Mr. Calixto-Filho's Arrest*

In the early morning hours of August 26, 2021, law enforcement officers arrested Mr. Calixto-Filho at his residence in Centennial, Colorado.  Officers executed the arrest under a warrant for conspiracy to distribute five kilograms or more of cocaine.  Doc. 546 at 3.  A United States Marshal Service (USMS) team entered defendant's residence while three investigators—Special Agent (SA) C.J. Atkins, Task Force Officer (TFO) George Lozano, and TFO Carl Bentley—waited outside.

According to defendant, the USMS team created an "atmosphere of fear, intimidation and distrust" during the arrest.  Doc. 534 at 1.  The defendant's wife, Gisele Calixto, testified that the officers pointed guns at her and her family—even her children—and handcuffed her son.  She also testified that the officers remained in her home for seven to eight hours.  Finally, she

testified that she heard her husband ask for a lawyer on three occasions while the investigators remained in her home.

By contrast, the government—when describing the arrest—focused on Mr. Calixto-Filho's eager cooperation with the investigators. According to testimony by SA Atkins, Mr. Calixto-Filho overwhelmed the investigators with a deluge of information about the Gamboa-Saenz Drug Trafficking Organization (DTO) from the get-go. Mr. Calixto-Filho allegedly functioned as a tech expert for the DTO. SA Atkins testified that Mr. Calixto-Filho was so eager to provide information that the investigators could hardly get a word in; when they tried to speak, Mr. Calixto-Filho continually interrupted them. SA Atkins also testified that Mr. Calixto-Filho—even before anyone asked him any questions—was "just letting it flow" with "excitement" and "energy," eager to provide information and, later, physical evidence. Indeed, he "bombarded" the investigators with so much information—and so readily—that TFO Bentley quickly became convinced the investigators needed to read Mr. Calixto-Filho his *Miranda* rights.

### *Advising Mr. Calixto-Filho of his* **Miranda** *Rights*

TFO Bentley testified that—given Mr. Calixto-Filho's eager willingness to provide a significant amount of information about the DTO—he knew that one of the investigators likely would want to ask Mr. Calixto-Filho a potentially incriminating question. So, TFO Bentley encouraged SA Atkins to read Mr. Calixto-Filho his *Miranda* rights at that point. And TFO Bentley handed SA Atkins his *Miranda* Warning card. Gov't Ex. 2.

SA Atkins testified that he, personally, would have preferred to wait a bit longer to read Mr. Calixto-Filho his *Miranda* rights. But, given TFO Bentley's nudge, SA Atkins went ahead and read the rights at about 6:46 a.m. local time. He read them directly from TFO Bentley's *Miranda* Warning card, and he read them in English. SA Atkins testified that he paused after each *Miranda* rights' sentence, as is his normal practice, to ask Mr. Calixto-Filho if he

understood.  And SA Atkins testified that Mr. Calixto-Filho responded with a "very energetic yes" to each statement.  After having read all five *Miranda* statements, SA Atkins asked Mr. Calixto-Filho if he waived his rights under *Miranda.*  And SA Atkins testified that Mr. Calixto-Filho responded that he was willing to talk with the investigators without an attorney present. When asked whether Mr. Calixto-Filho ever indicated that he wanted to stop talking or invoke his right to silence, SA Atkins testified that the investigators couldn't get him to stop talking, so, no, Mr. Calixto-Filho never manifested a desire to stop talking or remain silent.  TFO Bentley and TFO Lozano—both of whom witnessed SA Atkins read the *Miranda* warnings— corroborated Mr. Calixto-Filho's *Miranda* waiver.  SA Atkins also testified that Mr. Calixto-Filho never requested a lawyer.  And TFOs Lozano and Bentley offered blanket confirmations of SA Atkins's testimony.

The investigators didn't bring recording equipment with them to Mr. Calixto-Filho's residence because they intended to record a later interrogation of Mr. Calixto-Filho at the local DEA office.  SA Atkins testified that they never intended to conduct an interview in his home. So, the investigators couldn't record Mr. Calixto-Filho's *Miranda* waiver.  Nor was it captured in writing.  Because the investigators hadn't intended to interrogate Mr. Calixto-Filho at his residence, they didn't have a written *Miranda* waiver with them.  The investigators also never re-*Mirandized* Mr. Calixto-Filho.  As such, the recording of the interrogation conducted at the local DEA office doesn't include Mr. Calixto-Filho receiving or waiving his rights either.

### *Acquiring Physical Evidence from Mr. Calixto-Filho's Home*

According to the investigators, Mr. Calixto-Filho's willingness to cooperate continued after the *Miranda* warnings.  He began identifying physical evidence in his home office that he believed the investigators would find useful.  He directed them to papers about the DEA on his desk, explaining that he had tried already to report the DTO.  Mr. Calixto-Filho then informed

4

the investigators that part of his role as the DTO's tech guy included acquiring new phones for DTO members. And he kept the old phones in a box in his office closet—which he showed to the investigators and allowed them to take. He also consented to investigators taking laptop computers that he had used as a DTO member. In all, the investigators ended up with three laptops and 31 cell phones. Mr. Calixto-Filho explained to investigators that he had kept so many devices for his own protection. Mr. Calixto-Filho also provided investigators with pin numbers and passwords.

### *Interview at Local DEA Office*

After gathering the physical evidence, the investigators continued interviewing Mr. Calixto-Filho at the local DEA office. They audio recorded the interview, which they conducted entirely in English. The investigators never called in a Portuguese interpreter. SA Atkins testified that Mr. Calixto-Filho never requested an interpreter and never indicated that he had any difficulty understanding the investigators. The interview lasted about four hours and 53 minutes. This time included considerable periods of silence, however, and some periods of discussion between investigators. Mr. Calixto-Filho wasn't directly involved in these discussions between investigators. At the end of the interview, Mr. Calixto-Filho expressed his desire to continue working with the law enforcement officers. And the investigators assured him that they wanted to continue to collaborate as well.

## II.        Receiving and Waiving *Miranda* Rights

Mr. Calixto-Filho's brief contends that no one read him his *Miranda* rights and, thus, his statements to the three investigators weren't voluntary. Doc. 534 at 2, 4. So, he asks the court to suppress those statements. The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. A custodial interrogation may undermine this right against self-incrimination.

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  So, the prosecution must demonstrate the use of procedural safeguards—*i.e.*, administering *Miranda* warnings—to protect this Fifth Amendment right.  *Id.*  The government bears the burden to establish that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights, resulting in a "valid waiver." *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008) (citing *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002)).  And the government must establish the requisite waiver by a preponderance of the evidence.  *Id.*  "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).  Though "a waiver of rights must be clear, it does not have to be express." *Gell-Iren*, 146 F.3d at 830 (citing *North Carolina v. Butler*, 441 U.S. 369, 374– 76 (1979)).  Instead, "waiver can be inferred from the defendant's actions and words." *United States v. Nelson*, 450 F.3d 1201, 1211 (10th Cir. 2006) (quotation cleaned up).

Mr. Calixto-Filho never signed a written waiver of his *Miranda* rights.  Nor did the audio recording of his interrogation at the local DEA office capture a verbal waiver.  But all three investigators testified at the suppression hearing that SA Atkins read Mr. Calixto-Filho his *Miranda* rights while at Mr. Calixto-Filho's residence and used TFO Bentley's *Miranda* Warning card (Gov't Ex. 2) to do so.  And all three investigators agreed that Mr. Calixto-Filho waived those rights and agreed to continue talking with the investigators without an attorney. This testimony alone—from three law enforcement officers who gave the court no reason to question their credibility—sustains the preponderance of the evidence standard required to establish a *Miranda* waiver.  And Mr. Calixto-Filho's behavior provides additional support.

Mr. Calixto-Filho, apparently quite eager to share his knowledge with the investigators, spoke with them at length on the day of his arrest.  When the investigators decided to complete

the interview, Mr. Calixto-Filho wanted to continue collaborating and providing helpful information. The physical evidence Mr. Calixto-Filho voluntarily and consensually provided—including 31 cell phones and three laptops—also manifests a ready willingness to collaborate that aligns with a *Miranda* waiver. While neither Mr. Calixto-Filho's apparent disappointment about ending the interview nor his voluntary surrender of substantial physical evidence qualifies as an express waiver, his actions and words imply a waiver of rights. *Nelson*, 450 F.3d at 1211. The court thus concludes that the government has carried its burden to establish Mr. Calixto-Filho's waiver by a preponderance of the evidence. And so, the court denies Mr. Calixto-Filho's suppression motion to the full extent he premises the motion on the absence of waiver.

**III.      English Fluency and *Miranda* Waiver**

If the investigators read Mr. Calixto-Filho his *Miranda* rights, then, he asserts, "his fluency in English was not sufficient to knowingly and voluntarily waive his rights under *Miranda*[.]"  Doc. 534 at 2. He contends that "a Portuguese interpreter should have been called in" to ensure his understanding in his native tongue. *Id.*

A person must waive his Fifth Amendment privilege against self-incrimination "voluntarily, knowingly and intelligently[.]"  *Burson*, 531 F.3d at 1256 (citations omitted). Our Circuit employs a "totality of the circumstances approach" to determine whether a person has provided a valid waiver. *Id.* at 1256–57. "The purpose of the knowing and voluntary inquiry . . . is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Id.* at 1257 (internal quotation marks and citation omitted). Stating the obvious, to understand *Miranda* rights delivered in English, the recipient, of course, must understand English.

But a "non-native speaker's understanding of *Miranda* need not be ideal[.]" *United States v. Al-Saimari*, 982 F. Supp. 2d 1285, 1291 (D. Utah 2013). Tenth Circuit precedent

provides that "translation of a suspect's *Miranda* rights need not be a perfect one, so long as the defendant understands that he does not need to speak to police and that any statement he makes may be used against him." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990). A defendant's "objectively verifiable ability to understand and answer the questions posed to him during [an] interrogation[] provide sufficient proof that he knowingly and intelligently waived his Miranda rights[.]" *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000). On the other hand, a defendant's waiver may not qualify as knowing or voluntary when the defendant possesses only "survival language proficiency[.]" *Al-Saimari*, 982 F. Supp. 2d at 1288 (internal quotation marks omitted). An individual with just survival English understands simple English sentences involving basic necessities—not complex ideas or concepts—and responds to questions with one-word replies like "Yes" or "Okay." *Id.*

Here, the government seeks to discharge their burden to prove Mr. Calixto-Filho's ability to understand the English *Miranda* warnings by presenting both written and audio evidence. In the written category, the government contends the following evidence indicates a sufficient degree of fluency: Mr. Calixto-Filho's pro se filings in the case (Gov't Exs. 15, 16, 17, 18); his letter to SA Atkins (Gov't Ex. 6); his Facebook posts (Gov't Exs. 8, 9, 10); his personal journal (Gov't Ex. 3); and his text messages (Gov't Exs. 11, 12, 13). This written evidence—taken at face value—suggests a high level of English proficiency, more advanced than "survival" English.[1] And the written evidence contains some grammatical errors that indicate these writings

---

[1]    An excerpt from the letter to SA Atkins demonstrates this facial fluency:

> Mr. Atkins I ask of you that you take into consideration (based on the facts) that I am not a flight risk, I have not been charged or ever convicted of a violent offense. Also that my family is here in America, and have ties to the community [sic] Mr Atkins. . . . (please with these facts being taken into consideration) I would like to ask you to please let me go home on GPS monitoring.

weren't drafted by a native English speaker on Mr. Calixto-Filho's behalf or translated by using sophisticated software.  For instance, his letter to SA Atkins includes the following sentence:  "I help before and I am still want to help."  Gov't Ex. 6.  But the court can't ignore the possibility that an individual other than Mr. Calixto-Filho drafted these written documents.  And Mr. Calixto-Filho's wife testified that her husband was familiar with—and frequently used— Google's translation function.  What's more, the court's review of the pro se filings reveals repeated use of phrases specific to the court system— *i.e.*, "comes now," "ex parte hearing," "a stipulated order regarding discovery," and "pro se."  *See* Doc. 392 (Gov't Ex. 18).  Such phrases suggest Mr. Calixto-Filho may have availed himself of pattern documents or borrowed language. The possibility that Mr. Calixto-Filho utilized some kind of help when drafting these written materials undermines their persuasive value as conclusive examples of his English proficiency. So, the court cautiously credits these written examples but also requires more definitive evidence before it can conclude that Mr. Calixto-Filho's English proficiency didn't interfere with his waiver's voluntariness.

The government's audio evidence provides what's required.  Mr. Calixto-Filho's nearly five-hour interview with the investigators reveals his raw English language ability.  Gov't Ex. 1. To be sure, Mr. Calixto-Filho wasn't talking during the entire five hours.  *Id.*  And the recording includes some instances where Mr. Calixto-Filho couldn't recall an English word and so stumbled along or resorted to another language (substituting cucarachas for cockroaches, for example).  *Id.*  But it also includes many segments where Mr. Calixto-Filho communicated effectively without significant linguistic difficulty—stringing sentences together about the DTO's activities and members' relationships.  *Id.*  And he was able to respond to the

_____

(Gov't Ex. 6).

investigators' questions, though with occasional need for clarification or minor misunderstandings. *Id.* One investigator had to clarify the meaning of the word, "delay," for example. *Id.*

Even taking into account these difficulties, the audio recording demonstrates the ability to answer the questions posed to Mr. Calixto-Filho during the interview. Indeed, Mr. Calixto-Filho's answers were clear and substantive, regularly using more than "survival" one-word answers. *Al-Saimari*, 982 F. Supp. 2d at 1288. The investigators' interest in continued future conversation with Mr. Calixto-Filho also confirms the clear and substantive nature of his responses. At the end of the interview, the investigators enthusiastically expressed a desire to converse with him again "very, very, very soon." Gov't Ex. 1. This audio evidence, coupled with a cautious nod to the written evidence, suffices. The court concludes that Mr. Calixto-Filho could understand the *Miranda* warnings well enough to waive them knowingly and voluntarily. And so, the court denies Mr. Calixto-Filho's Motion to Suppress premised on his insufficient language abilities.

## IV.        Other Circumstances and Voluntariness

Finally, Mr. Calixto-Filho contends that other circumstances before the interview warrant suppressing his statements to the investigators. *First*, Mr. Calixto-Filho's brief—and his wife's testimony at the evidentiary hearing—assert that the USMS team "created an atmosphere of fear, intimidation and distrust." Doc. 534 at 1. *Second*, Mr. Calixto-Filho's brief, again supported by his wife's testimony, asserts that he "asked for a lawyer several times, but was told each time that he did not need one because he was not under arrest." *Id.* at 2. The court addresses each circumstance, below.

A.      Intimidation

While Mr. Calixto-Filho alleged an atmosphere of intimidation in the "Factual

Background" section, his brief never develops this argument.  To be sure, the brief addresses

voluntariness generally.  And it recites the five voluntariness factors from *United States v. Lugo*,

170 F.3d 996, 1004 (10th Cir. 1999).  But the brief never explains how these factors play out in

this case.  Nonetheless, out of an abundance of caution, the court evaluates whether the alleged

"atmosphere of fear, intimidation and distrust" affected the voluntariness of Mr. Calixto-Filho's

statements.  Doc. 534 at 1.

"When a defendant knowingly and voluntarily waives *Miranda* rights—absent

intimidation, coercion, or deception—such statements are admissible."  *United States v. Sanchez*,

No. CR-21-21, 2021 WL 2213301, at *1 (W.D. Okla. June 1, 2021) (citing *United States v.

Cash*, 733 F.3d 1264, 1282 (10th Cir. 2013)).  In the context of relinquishing *Miranda* rights,

voluntary means that the waiver "'was the product of a free and deliberate choice rather than

intimidation, coercion, or deception.'"  *Morris*, 287 F.3d at 988 (quoting *Colorado v. Spring*, 479

U.S. 564, 573 (1987)).  "A defendant's confession is involuntary if the government's conduct

causes the defendant's will to be overborne and 'his capacity for self-determination critically

impaired.'"  *United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir. 1996) (quoting

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)).  "'[C]oercive police activity is a

necessary predicate' to a constitutionally involuntary confession."  *United States v. Lamy*, 521

F.3d 1257, 1261 (10th Cir. 2008) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

A court determines voluntariness under a totality of the circumstances analysis,

accounting for "both the characteristics of the accused and the details of the interrogation."

*United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006).  *Lugo* outlined five factors helpful

for conducting such an analysis, including:

11

(1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment.

170 F.3d at 1004.

Here, Mr. Calixto-Filho's wife testified that the USMS team pointed guns at her and her family for 30 minutes, that they handcuffed her teenage son, and that they remained at her residence for seven to eight hours. But these allegations don't undermine the voluntariness of Mr. Calixto-Filho's statements. Neither the characteristics of Mr. Calixto-Filho nor the details of his interrogation suggest the USMS team or the investigators' conduct overcame his individual will. *McCullah*, 76 F.3d at 1101. None of Mr. Calixto-Filho's characteristics suggest he's prone to intimidation or coercion. Recall the first *Lugo* factor requires the court to consider the defendant's age, intelligence, and education. *Lugo*, 170 F.3d at 1004. Mr. Calixto-Filho was 41 years old at the time of the interrogation. And, while his educational background isn't part of the record, his intelligence manifests itself in multiple ways: his alleged role as tech guru in the DTO; his foresight in ferreting away 31 old DTO cell phones to ensure his own protection; his well-reasoned and articulate letter to SA Atkins (Gov't Ex. 6); and his multiple well-constructed pro se filings (Gov't Exs. 15, 16, 17, 18).

Nor do the details of the interrogation raise a red flag. The second *Lugo* factor evaluates the length of the detention and interrogation. Here, the investigators—assuming a definite six-hour time limit under 18 U.S.C. § 3501(c)—concluded the interrogation prematurely to ensure it wrapped up six hours after Mr. Calixto-Filho's arrest. Doc. 546 at 16 n.6. To be sure, Ms. Calixto testified that the officers remained at her residence for seven to eight hours. But the government highlighted a portion of the recorded interview which notes the time—making Ms. Calixto's recollection inconsistent with recorded evidence. The court thus declines to credit her

testimony.  And SA Atkins testified to remaining at the residence only as long as necessary to gather the physical evidence.  He even expressed frustration and impatience because of Mr. Calixto-Filho's continued talking when SA Atkins knew that "a number of other federal agents" were "kind of babysitting at this point and holding secure a scene."  Put together, this testimony and recorded evidence suggests the interview likely didn't last longer than six hours.  And the Tenth Circuit has noted the Supreme Court's description of aggressive law enforcement tactics includes an eight-to-nine hour sustained interrogation.  *United States v. Ray*, 799 F. App'x 599, 604 (10th Cir. 2020) (citing *Connelly*, 479 U.S. at 165).  But this interrogation was neither eight-to-nine hours nor sustained—there were breaks and frequent periods of silence.  And so, this second *Lugo* factor weighs in favor of voluntariness.

The final three *Lugo* factors also don't suggest that the particulars of the interrogation undermined Mr. Calixto-Filho's voluntariness.  The questioning—as recorded—sounds conversational and respectful, without any raised voices or threatening tones.  Mr. Calixto-Filho even laughed at points.  *See Ray,* 799 F. App'x at 604 (explaining that law enforcement officers' "conversational" tone and demeanor throughout their encounter demonstrated, in part, the voluntariness of the defendant's statements).  And, as the court determined above, the investigators advised Mr. Calixto-Filho of his constitutional rights at his residence.  Thus, *Lugo*'s fourth factor also indicates Mr. Calixto-Filho's voluntariness.  Finally, the fifth *Lugo* factor: apart from the USMS guns allegedly pointed at Mr. Calixto-Filho and his family when they entered the residence, no evidence suggests physical punishment or threats of them.  Ms. Calixto testified that the USMS team pointed guns at her and her family for about 30 minutes.  Once USMS had secured the scene and the investigators began talking with Mr. Calixto-Filho, SA Atkins testified that he neither witnessed anyone pointing a weapon at anyone else nor

unholstered weapons.  Also, he never displayed his weapon to Mr. Calixto-Filho.  And TFO Lozano confirmed by testifying that no one ever threatened Mr. Calixto-Filho and that no one ever unholstered a firearm or displayed one to him.  The evidence thus indicates Mr. Calixto-Filho made his statements absent any threat or physical punishment.

In sum, none of the *Lugo* factors weighs in favor of finding Mr. Calixto-Filho's statements involuntary for reasons of intimidation or otherwise.  The totality of the circumstances indicates that law enforcement officers didn't overbear Mr. Calixto-Filho's will.  The court thus denies Mr. Calixto-Filho's Motion to Suppress as premised on intimidation.  The court now turns to the final basis Mr. Calixto-Filho asserts for suppressing his statements: alleged denial of his attorney request.

## B.      Requesting an Attorney

In a final attempt to suppress his statements, Mr. Calixto-Filho asserts that "he asked for an attorney but was denied one."  Doc. 534 at 2.  When an individual subject to a custodial interrogation requests counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

Here, Ms. Calixto testified at the evidentiary hearing that she overheard her husband request a lawyer three times.  She also testified that Mr. Calixto-Filho made all three requests in the home's office.  Ms. Calixto remained in the living room at that time but testified that she nonetheless could hear her husband's requests.  He made all three requests in English.  When asked how she could decipher the requests at a distance and in a second language, Ms. Calixto testified that she knows the word "lawyer" in English.  But the evidentiary record indicates her level of English fluency may have limited her ability to decipher such a request—particularly

14

from another room.  Ms. Calixto utilized an interpreter in court.  And TFO Bentley testified that once the investigators returned property to the residence after Mr. Calixto-Filho's interrogation, Ms. Calixto's son had to translate for her.  Of course, it's possible that Ms. Calixto could have deciphered her husband's alleged attorney requests.  But the dual concerns of physical distance and a language barrier make such deciphering less likely.  And Ms. Calixto's accounting of the timeline—the previously discussed seven to eight hour duration—suggests to the court that she is an unreliable witness.

What's more, SA Atkins—who stayed in the office with Mr. Calixto-Filho—testified that Mr. Calixto-Filho never asked for an attorney; in fact, he didn't bring up the subject of an attorney at any point during the entire day.  The five-hour recorded interview indicates as much.  Mr. Calixto-Filho's apparent eagerness to talk to the investigators and share information and physical evidence with them also undercuts his involuntary argument.  Such willingness seems inconsistent with having invoked his right to counsel.  And so, the court denies Mr. Calixto-Filho's Motion to Suppress as premised on denial of requested counsel.

## V.      Conclusion

The court denies Mr. Calixto-Filho's Motion to Suppress (Doc. 534) under all four of his suppression theories.  The court concludes that the government has proven by the preponderance of the evidence that Mr. Calixto-Filho received and waived his *Miranda* rights.  And the government has met its burden to prove Mr. Calixto-Filho waived those rights knowingly and voluntarily, unhindered by his level of English proficiency and uninfluenced by any intimidation or denial of a right to counsel.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Dimas Simoes Calixto-Filho's Motion to Suppress (Doc. 534) is denied.

15

**IT IS SO ORDERED.**

**Dated this 18th day of June, 2024, at Kansas City, Kansas.**

                                         **s/ Daniel D. Crabtree**
                                         **Daniel D. Crabtree**
                                         **United States District Judge**